UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN CHARLES FOLINO, )
)
Plaintiff, ) Case No. 11 C 3556
)
v. ) Magistrate Judge Sidney I. Schenkier
)
MICHAEL ASTRUE, )
Commissioner of Social Security, )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER[1]

John Charles Folino seeks an order reversing and remanding the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (doc. # 25: Mot. for Summ. J.).[2] The Commissioner has filed a cross-motion for summary judgment (doc. # 33), in which he asks the Court to affirm the denial of benefits. For the reasons set forth below, the Court grants Mr. Folino's motion.

### I.

We begin with the procedural history of this case. Mr. Folino was 44 years old when he filed his application for DIB and SSI on November 5, 2007, alleging a disability onset date of November 1, 2006 (R. 123-34). His claims were denied initially on April 30, 2008 (R. 57-58), and on reconsideration, and a hearing was held before Administrative Law Judge ("ALJ") John Kraybill on January 14, 2010 (R. 41). The ALJ issued his decision denying benefits on January 28, 2010

---

[1]On November 14, 2011, by consent of the parties and in accordance with 28 U.S.C. § 636(c), this matter was reassigned to this Court for all further proceedings, including the entry of final judgment (doc. # 18).

[2]Mr. Folino filed a memorandum, but no reply brief, in support of his motion.

(R. 19). Mr. Folino timely requested review of the ALJ's decision, which the Appeals Council denied on April 8, 2011 (R. 1-4). Because the Appeals Council declined Mr. Folino's request for review, the ALJ's ruling represents the Commissioner's final decision. *Roddy v. Astrue*, No. 12 C 1682, 2013 WL 197924, at *4 (7th Cir. Jan. 18, 2013).

## II.

We next summarize the administrative record. We set forth the general background in Part A, the medical record in Part B, the hearing testimony in Part C, and the ALJ's written opinion in Part D.

### A.

On the alleged onset date of his disability, Mr. Folino was 45 years old and lived with his mother (R. 18, 27). He has a high school education (R. 18), and worked as a sheet metal worker for years until he was laid off in November 2006 (R. 27). From 2004 through 2006, he was "going through jobs left and right" because his eyesight was so bad that he could not see what he was doing (R. 39). His employers said the reason for termination was "lack of work," but Mr. Folino believed it was that they did not want "the hazard of somebody in my situation on the job" (*Id.*). His recent attempts to get jobs stocking shelves at hardware stores were unsuccessful (R. 38). At the time of the hearing in January 2010, Mr. Folino had not driven for at least two years (R. 28).

### B.

Ophthalmologist Robert Mack, M.D., began treating Mr. Folino in January 1996 for problems with his eyes, including thinning and melting of his corneas (*see, e.g.*, R. 323, 337). From 1996 to 1999, Dr. Mack observed "regression" of Mr. Folino's condition, including worsening visual

acuity (*Id.*). Dr. Mack performed several eye surgeries on Mr. Folino over the years, including placing a plastic drainage plug in his eyelids and irrigation (*see* R. 391).

From 2003 to 2005, Mr. Folino saw various doctors at Chicago Cornea Consultants. In October 2003, a doctor performed a corneal transplant in Mr. Folino's right eye (R. 283), and in September 2005, Dr. Epstein performed an emergency left corneal transplant and a permanent tarsorrhaphy (sewing the eyelids partially together to protect the eye) due to corneal thinning with ulceration and perforation (R. 244). By September 2005, however, "an exhaustive systemic evaluation has failed to reveal a precise etiology as to the corneal meltdowns that he has suffered" (R. 258, 300). The doctors prescribed anti-inflammatory and immuno-suppression medication such as prednisone (R. 258), but they repeatedly noted that Mr. Folino failed to show up for follow-up appointments and to comply with his medications (*see, e.g.*, 243-44, 258, 265).

Mr. Folino saw Dr. Mack again in September and October 2006 due to eye redness, irritation, and poor vision (R. 215). On September 5, 2006, Dr. Mack reported that Mr. Folino's visual acuity without correction was 20/150 in each eye, and he noted signs of stem cell failure in both eyes (R. 234). On November 28, 2007, an amniotic membrane graft was performed on Mr. Folino's left eye (R. 405), and on December 3, 2007, Dr. Suvendar Dwarakanathan did a second corneal transplant on Mr. Folino's left eye to fix a corneal perforation with active leak (R. 411).

On January 22, 2008, Dr. Brian Heffelfinger filled out an opthalmological report for the Bureau of Disability Determination Services ("DDS") based on his most recent examination of Mr. Folino on November 20, 2007 (R. 420). He wrote that Mr. Folino's visual acuity was 20/200 in the right eye and light perception only in the left eye (R. 421). No visual acuity with best correction was available for either eye because Dr. Heffelfinger saw Mr. Folino on an emergency

basis (*Id.*). Dr. Heffelfinger noted that Mr. Folino's ability to function or work would not be markedly improved with treatment or an appliance (R. 422). He opined that poor vision would limit Mr. Folino's ability to work because he was unable to drive or read (*Id.*).

On February 13, 2008, state agency doctor Ernst Bone, M.D., reviewed Dr. Heffelfinger's January 22, 2008 report. Dr. Bone noted Mr. Folino's history of corneal graft failure requiring corneal transplant, current visual acuity of 20/200 in the right eye with no light perception without correction, and light perception only in the left eye (R. 425). Dr. Bone determined that Mr. Folino's condition met Listing 2.02 (loss of visual acuity) (R. 423).

On February 16, 2008, Jerda M. Riley, M.D., provided a case analysis for DDS that disagreed with Dr. Bone's findings for the following reasons (R. 426). *First*, Dr. Riley noted that DDS guidelines require the agency to determine the best-corrected visual acuity; *i.e.*, the optimal visual acuity attainable with the use of a corrective lens (R. 427). The report relied on by Dr. Bone (Dr. Heffelfinger's report), however, noted only visual acuity without best correction (*Id.*). *Second*, Dr. Riley considered reports from Dr. Mack and Dr. Dwarakanathan from the end of 2007, which noted Mr. Folino's best corrected vision. Dr. Riley found that these reports showed that a listings level loss was not established (R. 428). *Third*, Dr. Riley observed that Mr. Folino had trouble reading and brought the paper very close to his face to read it, but he had no difficulty walking, writing, or seeing (*Id.*). Dr. Riley concluded that Mr. Folino's condition could be expected to restrict him from frequently reading typewritten print, sorting and inspecting small objects, operating moving vehicles, and working with hazardous machinery and at hazardous heights (R. 428). However, he found that the evidence does not restrict Mr. Folino from frequently handling large and medium sizes objects or working with ordinary hazards (*Id.*).

On April 21, 2008, the Quality Assurance Unit of DDS reviewed the state agency doctors' opinions and essentially adopted Dr. Riley's findings (R. 172), determining that while Mr. Folino has a severe impairment, it does not meet or equal a listing (R. 173). In the DDS report denying his claim for disability dated April 30, 2008 (R. 57-58), the state agency explained that while the medical evidence shows that Mr. Folino cannot return to his past work because his condition requires restrictions due to poor vision (such as avoiding work at unprotected heights and around hazardous equipment), he has the ability to do other types of work (R. 59).

In an undated letter faxed in September 2008, Dr. Dwarakanathan stated that Mr. Folino's right eye was "guarded but stable at the current time with a visual acuity of 20/800 that is best corrected to 20/50 with glasses," with some mild corneal scarring and light sensitivity (R. 439). His left eye "is in much worse condition;" it has a visual acuity of hand motion, and the potential for the left eye is unknown and is not stable for further surgery (*Id.*). Dr. Dwarakanathan further stated that Mr. Folino's condition is chronic and will require chronic care, and "while he has improved under care the future is unknown" (*Id.*).

The latest medical report in the record is from Spectrios Institute for Low Vision ("Spectrios"), dated October 7, 2009 (R. 440). The report states that Mr. Folino's visual acuity with his current glasses is 10/40-2 on the right and light perception only on the left (*Id.*). With "4X Telescope vision," his right eye was improved to 20/20 (*Id.*). The report noted that it was important for Mr. Folino to "follow up at Cook County as his condition in the right eye has a potential of getting much worse" (R. 441).

C.

Mr. Folino, medical expert ("ME") Robert G. Taub, M.D., and vocational expert Thomas A. Gusloff ("VE") testified at the administrative hearing on January 14, 2010.

Mr. Folino testified that in addition to his glasses, he has special adaptive equipment, including a large and small magnifier with a light that allow him to read the paper (R. 29). Even with the adaptive equipment, however, he has to stop reading after 5 or 10 minutes, for a few minutes at a time, because his right eye gets sore (R. 32). After 45 minutes of reading, he has to stop reading for about an hour due to soreness (R. 32-33). And, after three to four hours of reading this way, Mr. Folino has to stop reading for the day (R. 33).

Even with his glasses, he cannot see far away things, and to see small things in front of him, he has to be "on top over" them (R. 33). He uses a pocket telescope to focus on small signs in the distance; otherwise, he sees only a fog (R. 34-35). Mr. Folino also uses the telescope to read a computer screen, but after a half hour, his eyes get too sore to continue reading the computer screen for a while (R. 37-38). Bright sunlight and direct light make things very blurry, but overhead fluorescent lighting does not bother him (R. 35). Three weeks before the hearing, he was issued a walking cane, primarily to help him get around at night (R. 28).

Dr. Taub, a board-certified ophthalmologist, testified next. He reviewed the record in the case but did not personally examine Mr. Folino (R. 40-41). Dr. Taub testified that after two failed corneal transplants, Mr. Folino has essentially no vision in his left eye (R. 41). His right eye corneal transplant was successful, and as of the latest reading on October 7, 2009, the vision in his right eye was 10 over 40 (or roughly 20 over 80), with a reduction in his contrast sensitivity (R. 41-42).

Dr. Taub testified that Mr. Folino would have work limitations due to his impairment (R. 42). Specifically, he lacks depth perception and stereoscopic vision, so he should not hike or be around moving machinery, or in an environment with dust or other contaminants which would blur the vision in his good eye (*Id.*). Mr. Folino would also have a problem reading or working with small objects because the visual acuity in his good eye is only about 60 percent (R. 42-43). In addition, there is intrinsic loss of field of vision by the loss of vision in his left eye, so Mr. Folino should avoid heights (R. 45). Dr. Taub opined that Mr. Folino's testimony as to his limitations in reading and computer use – including that the maximum amount of time he could sustain reading or working with small objects was three to four hours in a day – was reasonable in light of his condition because he has some vascularization and dryness of the cornea in his good eye (R. 45-46).

The VE then testified that Mr. Folino's past relevant work includes work as a sheet metal worker, which was medium to heavy, skilled work (R. 48). He testified that the ME's limitation that Mr. Folino not work around heights, dust or eye contaminants, and dangerous moving machinery would eliminate the past relevant work (R. 49). The VE testified, however, that other medium, unskilled jobs exist in the regional economy that Mr. Folino could perform, including dryer attendant, machine feeder, molding machine operator helper, and production helper (R. 49-50).

Mr. Folino's attorney asked if the jobs the VE listed would also be available to someone "restricted from frequently reading typewritten prints, sorting and inspecting small objects, fine, detail, near precision work, [and required] to avoid operating moving vehicles, working with hazardous machinery and working at hazardous sites" (R. 50). The VE testified that those restrictions would not change the jobs available (R. 51). The VE explained that the jobs he listed would not require working in proximity to hazardous or moving machinery because those positions

7

do not require the individual to operate the machines (*Id.*). However, if Mr. Folino could not use his eyes for more than four hours a day for any work activity, that would eliminate all jobs (R. 55).

**D.**

In his written opinion, the ALJ found that Mr. Folino was not disabled under the Act (R. 11-19). At Step 1, he found that Mr. Folino has not engaged in substantial gainful activity since November 1, 2006, and at Step 2, he found that Mr. Folino has the following severe impairments: "failed cornea transplant in the left eye and right eye vision 10/40 which is 20/80" (R. 15). At Step 3, the ALJ found that Mr. Folino does not have an impairment or combination of impairments that meets or medically equals a listed impairment (*Id.*).

Between the third and fourth steps, the ALJ concluded that Mr. Folino has the residual functional capacity ("RFC") "to perform work at any exertional limit but with the following non-exertional limitations: avoid exposure to heights, moving machinery, and dust or other eye contaminants; avoid extensive reading and limited to 3-4 hours of close work; and no jobs that require near or far visual acuity or depth perception" (R. 16).

In formulating this RFC, the ALJ briefly reviewed Mr. Folino's testimony, the ME's testimony, the report faxed from Dr. Dwarakanathan in September 2008, and the October 7, 2009 report from Spectrios (R. 16-17). The ALJ dismissed Mr. Folino's testimony, stating that his "medically determinable impairments could reasonably be expected to produce the allege symptoms. However, the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible" (R. 17). Without further explanation, the ALJ then stated that he found Mr. Folino's statements "regarding the limiting effects and the severity of the symptoms of his impairments are only partially credible" (*Id.*).

The ALJ found that Dr. Taub's opinions were consistent with the record as a whole and gave them "substantial weight" (R. 17). The ALJ explained that "[u]nlike most of the claimant's other medical sources, Dr. Taub had the opportunity to review the claimant's entire record, including [] listen[ing] to him testify" (*Id.*). The ALJ did not assign weight to the opinion of any other doctor, and he did not mention any state agency opinions beyond stating that he has "also considered the opinions of the [DDS] medical consultants" (R. 15).

At Step 4, the ALJ found that Mr. Folino could not perform his past relevant work as a sheet metal worker, which was heavy and skilled work as he performed it (R. 17-18). Nevertheless, at Step 5, the ALJ found that jobs exist in significant number in the national economy that Mr. Folino can perform (R. 18).

### III.

Mr. Folino contends that the ALJ's opinion contains several errors that mandate remand. We agree.

### A.

It is well-established that "[a]n ALJ must consider all medical opinions in the record," *Roddy v. Astrue*, No. 12 C 1682, 2013 WL 197924, at *5 (7th Cir. Jan. 18, 2013), and the court "cannot uphold an administrative decision that fails to mention highly pertinent evidence." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). Moreover, "[a] treating physician's medical opinion is entitled to controlling weight if it is well supported by objective medical evidence and consistent with other substantial evidence in the record," and an ALJ is "required to provide a sound explanation for his decision" not to give a treating physician's opinion controlling weight. *Roddy*, 2013 WL 197924, at *5 (collecting cases).

Here, as Mr. Folino notes, the ALJ failed to consider a wealth of medical reports in the record (*see* doc. # 26: Pl.'s Mem. at 12), including reports from Drs. Mack, Heffelfinger, and Epstein, all of whom were Mr. Folino's treating physicians. In addition, while the ALJ mentioned the opinion of Mr. Folino's surgeon, Dr. Dwarakanathan, he failed to explain what weight, if any, he assigned to that opinion. These shortcomings require reversal and remand.

Moreover, as described above, there was a conflict between the state agency reports on the question of whether Listing 2.02 was met: Dr. Bone found that the Listing was met, but Dr. Riley disagreed. The ALJ's opinion does not acknowledge this conflict. To the contrary, his only statement at Step 3 was that he "considered the opinions of the [DDS] medical consultants who have evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion" (R. 15). This statement leaves us in the dark as to whether the ALJ in fact gave any consideration to Dr. Bone's report (which did not reach the same conclusion as Dr. Riley's report), or if he did, why he chose to disregard it. "[W]hen the evidence comes in the form of a medical opinion from a state agency physician, the agency's own regulations and rules require that the ALJ 'not ignore these opinions and must explain the weight given to the opinions in their decisions.'" *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011) (citing S.S.R. 96–6p; *see also* 20 C.F.R. § 404.1527(f)). The ALJ's failure to do this here was error, and requires reversal and remand.

In his brief, the Commissioner goes into much detail about the state agency physician opinions, specifically, why Dr. Riley's opinion that Mr. Folino's impairments do not meet or equal a Listing should be accepted over Dr. Bone's contrary opinion (*see* doc. # 34: Comm'r Mem. at 6-8). By our ruling, we do not suggest that Dr. Bone's opinion must carry the day or that the ALJ was

compelled to accept it. But, the ALJ was required to explain *why* he accepted one opinion over the other. His failure to do so cannot be cured by a *post hoc* rationale offered by the government. As the Seventh Circuit has repeatedly held, "'what matters are the reasons articulated *by the ALJ*,' not the rationale supplied by the Commissioner on appeal." *Mueller v. Astrue*, No. 11 C 3013, 2012 WL 3575274, at *4 (quoting *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011)) (emphasis in the original); *see also Roddy*, 2013 WL 197924, at *6; *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). Not only does the Commissioner's rationale on appeal not matter, but the Seventh Circuit has recently warned that raising arguments and rationales on appeal that were not articulated by the ALJ below "[c]haracteristically, and sanctionably, . . . violates the *Chenery* doctrine." *Hughes v. Astrue*, No. 12-1873, 2013 WL 163477, at *3 (7th Cir. Jan. 16, 2013).

**B.**

The ALJ's credibility determination was insufficiently explained. ALJ used meaningless boilerplate – and little else – to state his finding that Mr. Folino was "not entirely credible" (R. 17). The government recognizes that the Seventh Circuit has been less than charitable in condemning this kind of credibility finding as insufficient (Comm'r Mem. at 11). And, the appeals court has recently emphasized that the use of boilerplate as a substitute for a reasoned credibility finding has been "consistently criticized." *Roddy*, 2013 WL 197924, at *4 (collecting cases).

But, the government also correctly points out that the use of this boilerplate does not require a remand when it merely stands as a statement of a conclusion that is otherwise sufficiently explained by the ALJ (Comm'r Mem. at 11, citing *Richison v. Astrue*, 462 F. App'x 622, 625-26 (7th Cir. 2012); *Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011)). This Court has made the same observation in the past. *See, e.g., Lange v. Astrue*, No. 11 C 2958, 2012 WL 5818258, at *14 (N.D.

11

Ill. Nov. 14, 2012); *Sombright v. Astrue*, No. 10 C 2924, 2011 WL 1337103, at *14 (N.D. Ill. Apr. 6, 2011). The government seeks refuge in this authority by arguing that here, "the ALJ said more" to support his credibility finding than merely reciting boilerplate (Comm'r Mem. at 11). However, the record does not support that assertion. Although the ALJ discussed various portions of the evidentiary record in the several paragraphs preceding his credibility determination, he did not connect that discussion to the credibility determination (R. 16-17). For example, he did not explain what parts of Mr. Folino's claimed limitations he found lacking in credibility, or what evidence led him to that finding. It is not enough to recite evidence and then state a conclusion; the ALJ must construct "'an accurate and logical bridge' between the evidence and his conclusions." *See Roddy*, 2013 WL 197924, at *5 (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008); *McKinzey*, 641 F.3d at 891).

The government also attempts to explain – and, perhaps, defend – the pervasive use of boilerplate language that the Seventh Circuit has so harshly criticized. The government states that this language "is from the agency's decisional templates, used by its 1,400 ALJs to assist ALJs in issuing decisions from an estimated 800,000 hearings in 2011, or over 600 hearings per ALJ" (Comm'r Mem. at 10). The Court takes that statement as a plea for understanding that ALJs cannot hope to process this crushing caseload without the use of boilerplate language. To be sure, we are mindful of this caseload, as this district has itself seen an exponential increase in the filing of social security appeals. We sympathize with ALJs when we consider the burden they bear in doing the important work of deciding disability claims. But the desire to process a caseload as expeditiously as possible cannot justify the sue of mere boilerplate statements in lieu of the kind of analysis that is required by the case law and the Agency's own regulations. *See Shauger v. Astrue*, 675 F.3d 690,

696 (7th Cir. 2012) (in determining a claimant's credibility, the ALJ must consider a number of factors imposed by regulation in 20 C.F.R. § 404.1529(c)[3] and SSR 96–7p ("Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements"),[4] and must support credibility findings with evidence in the record).

Such analysis is required for a good reason: it is necessary to allow a court on review to discharge its responsibility to ensure that the ALJ's opinion is supported by substantial evidence, and to explain to people why their claims of disability are being rejected. The government may consider it impractical to expect ALJs to perform that kind of analysis given their current caseload. But well-settled and controlling case law makes clear that explaining credibility determinations is an affirmative duty of ALJs, and not something that is merely optional.

The ALJ's failure to provide an appropriate credibility analysis here requires us to reverse and remand. *See Bjornson v. Astrue,* 671 F.3d 640, 644-45 (7th Cir. 2012).

---

[3] In evaluating the intensity and persistence of a claimant's symptoms, such as pain, and determining the extent to which the symptoms limit the claimant's capacity for work, the Social Security Administration will consider the objective medical evidence, and the claimant's "(i) [] [D]aily activities; (ii) The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [his or her] pain or other symptoms; (v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of [his or her] pain or other symptoms; (vi) Any measures [the claimant] use[s] or ha[s] used to relieve [his or her] pain or other symptoms. . .; and (vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms." 20 CFR § 404.1529(c).

[4] "In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. . . . It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *1-2 (July 2, 1996).

## CONCLUSION

For the reasons set forth above, we grant Mr. Folino's motion to reverse and remand the Commissioner's decision denying his applications for disability benefits (doc. # 25), and deny the Commissioner's cross-motion to affirm (doc. # 33). The case is reversed and remanded for further proceedings consistent with this opinion.[5] While we must remand here, we do not suggest that Mr. Folino inevitably must be found disabled. That is a decision for the ALJ to make based on an analysis of all relevant evidence. The case is terminated.[6]

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: February 11, 2013

---

[5]We deny Mr. Folino's request that we order a new hearing or a new ALJ on remand (Pl.'s Mem. at 14-15).

[6]Because we reverse and remand on the foregoing grounds, we deem it unnecessary to consider other criticisms of the ALJ's opinion contained in the claimant's memorandum.

14